## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

BRIAN M. J.,                                    Case No. 22-12962

       *Plaintiff,*                       Thomas L. Ludington
                                               United States District Judge
*v.*
                                               Patricia T. Morris
COMMISSIONER OF                                United States Magistrate Judge
SOCIAL SECURITY,

       *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 10, 12)

## I.  RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Plaintiff Brian J.'s Motion for Summary Judgment be **DENIED** (ECF No. 10), Defendant's Motion for Summary Judgment be **GRANTED** (ECF No. 12), and the Commissioner's final decision be **AFFIRMED**.

## II.  REPORT

### A.  Introduction and Procedural History

Plaintiff's application for Disability Insurance Benefits was filed on October 28, 2019.  (ECF No. 6-6, PageID.224).  Plaintiff alleged he became disabled on October 28, 2018.  (*See id.*).  The Commissioner denied these claims initially on

1

January 29, 2020 and upon reconsideration on November 16, 2020. (ECF No. 6-4, PageID.110, 130). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which took place on November 16, 2021. (ECF No. 6-3, PageID.52; ECF No.6-5, 141–44, 157). The ALJ issued a decision on December 2, 2021, finding that Plaintiff was not disabled. (ECF No. 6-3, PageID.47). The Appeals Council denied review on October 3, 2022. (ECF No. 6-3, PageID.21). Plaintiff sought judicial review on December 7, 2022. (ECF No. 1). The parties have filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 10, 12).

### B. Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286. (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . .

or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*,

459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 6-3, PageID.47). At Step One, the ALJ found Plaintiff had not engaged in substantial gainful activity ("SGA") since October 28, 2018. (*Id.* at PageID.37). At Step Two, the ALJ found the following impairments severe: gunshot wound to the left hip and thigh with fracture of the left femur and iliac vein injury to the left leg; status post arthrotomy left hip joint; and deep vein thrombosis left femoral vein. (*Id.* at PageID.37–38). At Step Three, he found that none of the impairments, either independently or in combination, met or medically equal in severity or duration the criteria listings of 1.18, 1.19, 1.22, or any other listing. (*Id.* at PageID.38). The ALJ noted that although the claimant used a walker for a short period of time following his gunshot wound, subsequent medical records noted that claimant either used a cane or did not require assistance when standing or walking. (*Id.* at PageID.39). Further, the examinations failed to note any deficits to upper extremity strength or function. (*Id.*). Thus, the ALJ concluded that as the medical record was void of medical documentation of the need for an assistive device

requiring the use of both hands or the inability to use one or both upper extremities, claimant's impairments did not rise to listing level severity under Listings 1.18, 1.19, and 1.22. (*Id.*).

Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work with the use of a cane with prolonged ambulation. (*Id.*). He can occasionally: (i) climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and (ii) balance, stoop, kneel, crouch, and crawl. (*Id.*). Plaintiff can never work at unprotected heights. (*Id.*). At Step Four, the ALJ found that Plaintiff was unable to perform his past relevant work. (*Id.* at PageID.45). At Step Five, the ALJ cited to the VE's testimony in support of his determination that Plaintiff could perform a significant number of jobs in the national economy, including the light exertion work of router or investigator dealer accounts. (*Id.* at PageID.46–47). Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.* at PageID.47).

### E.  Administrative Record

#### 1.  Overview of Medical Evidence

##### a.  Treatment Notes

On October 18, 2018, Plaintiff suffered a gunshot wound to his lower left abdominal area that caused deep vein thrombosis of the left common femoral artery, broken left hip with damage to the soft tissue and pelvis and femur. (ECF No.6-8, PageID.310, 315). His November 12, 2018 Henry Ford Allegiance Health discharge

6

papers contain a prescription for a walker.  (*Id.* at PageID.438).  During his stay at the hospital, Plaintiff used a walker to ambulate for various reasons (e.g., access the lavatory).  (*Id.* at PageID.729–33).

Following his release from the hospital, Plaintiff underwent physical therapy treatment at Henry Ford Health System.  The April 2019 treatment notes indicate that at times Plaintiff was experiencing low levels of pain (level 2 pain on a 10-point scale), was able to complete the stretches without issues or questions, and at times needed cues to slow the movements down.  (ECF No. 6-8, PageID.391, 393).  The April 2019 notes also indicate that on some days Plaintiff presented an irregular gait and moved slowly during the treatment as he noted he could feel his muscles growing fatigued.  (*Id.* at PageID.392).  The notes also indicate that while Plaintiff has made progress towards his treatment goals, he has not made much due to his 50% attendance rate.  (*Id.* at 394).

The May 2019 physical therapy notes indicate Plaintiff reported he felt about the same and reported pain between 4 to 7 on a 10-point scale.  (*Id.* at PageID.395).  A later set of May 2019 notes indicate Plaintiff was "making progress with therapy" and "tolerated all exercises done during treatment without complaints."  (*Id.* at PageID.398).  Plaintiff's hip "felt 'looser' and he was able to walk with decreased pain at the end of treatment."  (*Id.*).  While the treatment notes indicated Plaintiff

should continue taking aspirin for pain, they do not include a notation for an ambulatory device.

### b. State Agency Medical Consultant Reports

Dr. Katherine Alizo found Plaintiff's statements regarding his symptoms to be partially consistent considering the medical and non-medical evidence in the record. (ECF No. 6-4, PageID.105). Dr. Alizo noted that while Plaintiff's left leg gunshot wound ("GSW") and DVT left common femoral vein could reasonably be expected to produce some symptoms, "their intensity and the effect on functioning [were] not consistent with the total evidence in [the] file." (*Id.* at PageID.105). She found that Plaintiff could (i) occasionally lift and/or carry up to 20 pounds, (ii) frequently lift and/or carry 10 pounds, (iii) stand and/or walk for about 6 six hours in an 8-hour workday, and (iv) sit for about 6 hours in an 8-hour workday. (*Id.* at PageID.106). Further, Plaintiff had the following postural limitations: (i) occasional climbing ramps/stairs, (ii) never climbing ladders/ropes/scaffolds, (iii) occasional balancing, (iv) occasional stooping, (iv) occasional kneeling, (v) occasional crouching, and (vi) occasional crawling. (*Id.* at PageID.106–07). Dr. Myung Ho Hahn reconsidered Dr. Alizo's opinion and agreed with the findings. (*Id.* at PageID.130).

### c. Function Report

In his function report, Plaintiff represents that he is able to shower on his own, prepare meals a few times a week, which on average takes between 20 to 30 minutes, occasionally do light laundry, and will typically watch TV or talk on the phone. (ECF No. 6-7, PageID.259). He noted that he can only lift 10 to 15 pounds and maybe walk half a block but does not do any shopping. (*Id.* at PageID.262–63). On his report, he stated that he needed a cane but noted that he was prescribed crutches and a walker in November 2018 and needed to use these tools on a daily basis. (*Id.* at PageID.264). Last, the only medication he identified as taking for his illness, injuries, or conditions was aspirin, an over-the-counter treatment. (*Id.* at PageID.265).

### 2. Overview of Hearing Testimony

### a. Plaintiff's Testimony

Plaintiff testified that from the 1990s until 2011 he worked for Mail Operations as an Operations Assistant while at Consumer Energy. (ECF No. 6-3, PageID.59). In that role, he would lift between 30 to 50 pounds and was mostly on his feet. (*Id.* at PageID.59–60). Next, he worked at Allegiance Health as a mail clerk from 2015 to 2017. (PageID.61). This position involved a significant amount of walking, climbing up and down ladders, and picking up items. (*Id.* at PageID.62). The last job of significance during his testimony was his employment as a teacher's aide at a school where he worked full time and made between $15 - $17 an hour

from the 2018–2019 school year.  (*Id.* at PageID.63, 65).  In that role, he would accompany the students from the bus to various parts of the school, assist with class lessons, and intervene when altercations arose in the classroom.  (*Id.* at PageID.64). This required him to spend most of his time standing and at times he would be called to physically lift a child to stop an altercation.  (*Id.* at PageID.67).  Now, Plaintiff spends most of his time in the upstairs portion of his home to avoid having to climb the stairs.  (*Id.* at PageID.68).  He continues to drive but not as often as it has become difficult and can only drive for about 15 to 20 minutes before it becomes too difficult for him.  (*Id.*).

Plaintiff testified that he used a walker to ambulate from 2018 to 2020.  (*Id.* at PageID.71).  And at the time of the hearing, he was still on a cane restriction.  (*Id.* at PageID.72).  He uses the cane at all times for balance, both inside and outside of his home, and it has prevented him from falling on a few occasions.  (*Id.* at PageID.72, 82).  His mother and sister come to his home to check on him periodically and during those visits, they will wash his dishes, do his laundry, bring him groceries, and cook him meals. (*Id.* at PageID.74–76).  Occasionally, he will go grocery shopping for himself but can only pick up a few items and typically rides in the electrical power cart.  (*Id.* at PageID.76).  Once in a while, he will make a quick meal (e.g., canned soup) at home but spends most of the day on the couch with his left leg propped.  (*Id.* at PageID.76, 80).

### b. Vocational Expert's Testimony

Amy Shelton, Vocational Expert ("VE"), testified during Plaintiff's hearing. She testified that Plaintiff's previous positions qualified as follows:

- Mail clerk had the "DOT [code of] 209.687-076, with an SVP of 2, at the light- duty range per the DOT, [and] [t]he composite was performed at medium based on [Plaintiff's] testimony." (ECF No. 6-3, PageID.84).

- Mail truck driver position had a DOT code of 906.683-022, "with an SVP of 3, at the medium duty range per the DOT, performed at medium based on [Plaintiff's] testimony. . . ." (*Id.* at PageID.84).

- Laborer had a DOT code of 922.687-058, "with an SVO of 2, at the medium duty range per the DOT, and the composite was performed at medium." (ECF no. 6-3, PageID.84).

- Childcare attendant had a DOT code of 355.674-010, "with an SVP of 2, at the medium duty range per the DOT, [and was] performed between medium and very heavy based on [Plaintiff's] testimony." (ECF No. 6-3, PageID.84–85).

After collecting this information from the VE, the ALJ proceeded to present the VE with several hypotheticals. The ALJ posited the following hypothetical:

> Assume we had an individual [that] would be limited to the range of light work as normally defined in the

11

> Dictionary of Occupational Titles in terms of lifting, carrying, sitting, standing, and walking, but would be limited to use of cane with prolonged standing or ambulation; further limited to occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; and no work at unprotected heights. [. . .]  Would an individual at that functional capacity be able to do any of the [claimant's] past work here?

(*Id.* at PageID.85, 94).  The VE testified that they would not and past work would be eliminated.  (*Id.*).  However, the VE testified that there is light work in the national economy that someone with the previously mentioned functional capacity could perform.  (*Id.*).  The VE offered router and investigator dealer accounts.  (*Id.* at PageID.94).  The ALJ clarified that these jobs are light and would not preclude prolonged standing or prolonged ambulation.  (*Id.* at PageID.95).  Finally, if the individual needed to elevate either leg or both legs to waist level during the workday this would be work preclusive.  (*Id.* at PageID.92).  The VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles.  (*Id.* at PageID.96).  She also explained that she relied upon some updated data from the Bureau of Labor Statistics Occupational Research Survey when testifying.  (*Id.*).

## F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27,

2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

   (1)   Licensed physician (medical or osteopathic doctor);

   (2)   Licensed Psychologist, which includes:

       (i)   A licensed or certified psychologist at the independent practice level; or

       (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

   (3)   Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

   (4)   Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

   (5)   Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

   (6)   Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)   Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)   Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph

14

(c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.*  The

SSA will consider several factors when it contemplates "the medical opinion(s) and

prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability."  This factor considers that "[t]he

more relevant the objective medical evidence and supporting explanations presented

by a medical source are to support his or her medical opinion(s) or prior

administrative medical finding(s), the more persuasive the medical opinion(s) or

prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the

consideration that "[t]he more consistent a medical opinion(s) or prior administrative

medical finding(s) is with the evidence from other medical sources and nonmedical

sources in the claim, the more persuasive the medical opinion(s) or prior

administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*,

§ 404.1520c(c)(3). This factor will include the analysis of:

(i)   Length of the treatment relationship. The length of time a
      medical source has treated you may help demonstrate whether
      the medical source has a longitudinal understanding of your
      impairment(s);

(ii)  Frequency of examinations. The frequency of your visits with the
      medical source may help demonstrate whether the medical
      source has a longitudinal understanding of your impairment(s);

15

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity

16

with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

17

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2).   As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

18

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

19

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by

20

the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs

and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, §
404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms,
including pain, we will consider all of the available evidence, including your medical
history, the medical signs and laboratory findings, and statements about how your
symptoms affect you." *Id.*, § 404.1529(a).   The SSA clarified that it will "then
determine the extent to which your alleged functional limitations and restrictions due
to pain or other symptoms can reasonably be accepted as consistent with the medical
signs and laboratory findings and other evidence to decide how your symptoms
affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater
severity of impairment than can be shown by objective medical evidence alone, we
will carefully consider any other information you may submit about your
symptoms."   This other information may include "[t]he information that your
medical sources or nonmedical sources provide about your pain or other symptoms
(e.g., what may precipitate or aggravate your symptoms, what medications,
treatments or other methods you use to alleviate them, and how the symptoms may
affect your pattern of daily living)," which "is also an important indicator of the
intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]"   *Id.*   The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)    [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

(iii)  Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work."   *Id.*, § 404.1530(a).   Stated differently, "[i]f you do not follow the prescribed treatment without a good reason,

23

we will not find you disabled or, if you are already receiving benefits, we will stop

paying you benefits." *Id.*, § 404.1530(b).  Acceptable (or "good") reasons for failure

to follow prescribed treatment include:

(1)    The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)    The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)    The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

## G.  Arguments and Analysis

Plaintiff contends that the ALJ made the following three erroneous findings:

(i) Plaintiff could perform light work; (ii) the treating doctor's opinion was not

persuasive[1]; and (iii) Plaintiff did meet and/or equal Listing 1.18.  (ECF No. 10,

PageID.1157).  I will address each argument independently.

---

[1] As the Commissioner pointed out, the ALJ found Dr. Daly's opinion partially persuasive. (ECF No. 6-3, PageID.44).

24

### a. The ALJ's Light Work Exertional Finding Is Supported by Substantial Evidence

Plaintiff's overall position is that light work requires an individual be able to stand and walk for approximately six hours out of an 8-hour workday and frequently lift or carry objects weighing up to 10 pounds and as such, an individual with Plaintiff's limitations (i.e., consistent need to use a cane) cannot perform the "standing, walking, and lifting entailed in the performance of light work." (*Id.* at PageID.1163, 1165). Further, he argues that the ALJ's decision is not supported by substantial evidence because he did not credit fully the DDS medical consultants—Katherine Alizo, M.D., and Myung Ho Hahn, M.D.—when they offered opinions about light work, or Plaintiff's treating vein specialist, Dr. John Daly. (*Id.* at PageID.1165).

The Commissioner contends that Plaintiff's argument should be rejected as there is no per se rule in this district that individuals who need to use a cane are precluded from performing light work. (ECF No. 12, PageID.1182–83). The Commissioner goes on to represent that the ALJ's findings were supported by the state agency medical consultants' prior administrative medical findings and the ALJ found Plaintiff was even more limited than assessed by the medical consultants based on his review of the medical evidence and a restriction with respect to using a cane for prolonged ambulation was warranted. (*Id.* at PageID.1184). Last, the Commissioner argues that Plaintiff's position ignores the fact that the VE identified

25

several jobs in the national economy that someone with Plaintiff's limitations (i.e., need to use a cane for prolonged ambulation) could perform.  (*Id.* at PageID.1185).

"Light work" is an exertional standard defined in the regulations and the *Dictionary of Occupational Titles* (DOT).  In the regulations, the standard requires the ability to "lift [ ] no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."   20 C.F.R. §§ 404.1567(b), 416.967(b).  In addition, it demands "a good deal of walking or standing, or when it involves sitting most of the time" some pushing and pulling of arm or leg controls is required.  *Id.*  As the Commissioner points out, the caselaw in this district "has found that the use of a cane does not preclude lightwork."  *Marko v. Comm'r of Soc. Sec.*, 2017 WL 3116246, at *5 (E.D. Mich. July 21, 2017) (collecting cases); *see also Scott v. Comm'r of Soc. Sec.*, 2018 WL 6175375, at *6 (E.D. Mich. Nov. 5, 2018) ("Thus, courts have recognized that there is no *per se* rule that use of a cane to ambulate preludes performance of all light jobs."), *rep. & rec. adopted by* 2018 WL 6171602 (E.D. Mich. Nov. 26, 2018).  Thus, whether a plaintiff, who requires a cane, may perform light work turns on the facts before the ALJ.  And in such instances the ALJ should consult with a VE, which was done in this case.  *See Collins v. Comm'r of Soc. Sec.*, 2019 WL 3421696, at *10 (E.D. Mich. June 30, 2019) ("Here, the RFC expressly recognizes Collins' need for a cane to ambulate, and . . . the vocational expert has testified that Collins could perform a significant number of jobs in the

light work category despite his need to use a cane to ambulate . . . . Thus, the undersigned finds no error in the formulation of the RFC."), *rep. & rec. adopted by* 2019 WL 3412744 (E.D. Mich. July 29, 2019); *Scott v. Comm'r of Soc. Sec.*, 2015 WL 4634077, at *6–7 (E.D. Mich. July 6, 2015) (finding no reversible error where the VE "specifically testified that a significant number of jobs in the light work category were available for a person with plaintiff's RFC as stated by the ALJ and who needed to use a cane for walking and standing"), *rep. & rec. adopted by* 2015 WL 4633927 (E.D. Mich. Aug. 3, 2015). Here, the ALJ posited a hypothetical to the VE, which emphasized the cane requirement, and the VE confirmed light work existed in the national economy which Plaintiff could perform. (ECF No. 6-3, PageID.94). The VE testified clearly that Plaintiff can perform a few jobs in the "light work" category despite the need for a cane.

Further, Plaintiff cites Social Security Rule ("SSR") 96-9p for the notion that the ability to perform sedentary work may be impacted by the use of a cane. (ECF No. 10, PageID.1164). Plaintiff attempts to use SSR 96-9p and expand the language beyond the potential limitations discussed within.[2] A similar argument was raised

---

[2] In fact, SSR 83-14, which addresses light work does not preclude an individual with a cane requirement from performing such work. *See Scott v. Comm'r of Soc. Sec.*, 2018 WL 6175375, at *6 (E.D. Mich. Nov. 5, 2018) (citing *Soc. Sec. Rul. 83-14*, 1983 WL 31254, at *4 (Jan. 1, 1983)). At most, it states that a significant number of light jobs "'require a person to be standing or walking most of the workday,' and the 'full range' of light work requires 'frequent lifting or carrying of objects weighing up to 10 pounds[.]'" *See id.*

in *Colbert v. Comm'r of Soc. Sec.* and there the court found that "nothing in SSR 96-9p's discussion of assistive devices supports it."  2019 WL 7584526, at *22 (E.D. Mich. Aug. 27, 2019).  I am inclined to follow suit.  The SSR states that an individual's ability to perform light work "may" be impacted by the use of a cane, not "will" be impacted.  And thus, the SSR itself simply observes a possibility that a cane requirement may erode the job base for lightwork.

Plaintiff also argues that the ALJ did not credit the DDS medical consultants fully when they offered their opinion about light work but provides no further explanation as to how the ALJ failed to do so.  This is most likely because the ALJ did consider and credit their opinions as both medical consultants assessed that Plaintiff "demonstrate[d] the maximum sustained work capability for . . . light [work]."  (ECF No. 6-4, PageID.109, 129).  Moreover, in addition to crediting their assessments, the ALJ included an additional restriction on the RFC by including a cane requirement.

As none of Plaintiff's arguments are persuasive the undersigned suggests that the ALJ fulfilled his requirement to justify his conclusion that "light work jobs" remain available for Plaintiff to work despite the cane requirement.

### b.  The ALJ Properly Evaluated Dr. Brian Daly's Opinion

Plaintiff argues that in finding Dr. Daly's opinion not persuasive, the ALJ did not consider the evidence as a whole and instead "focused on isolated statements in

the progress notes indicating improvement."   (ECF No. 10, PageID.1165–66).

Plaintiff also argues that the ALJ did not articulate his analysis of the opinion in

enough detail for the Court to determine whether he relied on substantial evidence

in rejecting Dr. Daly's opinions.  (ECF No. 10, PageID.1168).  The Commissioner

argues that Dr. Daly's statement that Plaintiff was unable to work is not considered

a medical opinion and thus "not entitled to any special significance."  (ECF No. 12,

PageID.1188).

        The pertinent portions of Dr. Daly's opinion indicate that Plaintiff's injury

"may keep him for being able to fully use his left leg" and that "given the chronic

neurological damage [Plaintiff] may require disability for the time being."  (ECF

No. 6-8, PageID.945).  The ALJ found this statement partially persuasive as far as

the opinion indicated that the claimant had some restrictions as a result of his

injuries.  (ECF No. 6-3, PageID.44–45).  These findings were supported by the

record but  further restrictions beyond the RFC were not warranted.  (*Id.* at

PageID.45).

        First, I will address Dr. Daly's statement that Plaintiff may be disabled.  The

ALJ noted in his opinion that he "did not analyze (i) any disability decisions by other

governmental agencies and non-governmental entities, (ii) state agency disability

examiner findings, or (iii) statements on issues reserved to the Commissioner

(including statements that a claimant is disabled or able to work). . . " and indicated

that several of Dr. Daly's statements indicated that the claimant was not able to work. (ECF No. 6-3, PageID.45).  The ALJ's decision to take this approach was proper as under 20 C.F.R. § 416.927(e), the regulations specifically caution that opinions which state an individual "is disabled" or "unable to work" should not be given special significance as they intrude upon issues which are reserved to the Commissioner.  *See Carreon v. Massanari*, 81 F. App'x 571, 574 (6th Cir. 2002).

The ALJ went on to explain that the evidentiary record including Plaintiff's own statements do not support the conclusion that he cannot perform work activities consistent with the adopted residual functional capacity.  (ECF No. 6-3, PageID.45). A reading of ALJ's decision as a whole and a review of the evidentiary record, show that this finding is supported.  For example, Plaintiff's April 2019 and May 2019 treatment notes indicate that at times Plaintiff was experiencing low levels of pain (level 2 pain on a 10-point scale), could complete the stretches without issues or questions, and in some instances needed cues to slow the movements down.  (ECF No. 6-8, PageID.391, 393, 395, 398).  While the treatment notes indicated Plaintiff should continue taking aspirin for pain, they do not include a notation for an ambulatory device.  Further, Plaintiff's function report indicated that he prepares meals a few times a week, which on average takes between 20 to 30 minutes, occasionally does light laundry, and will typically watch TV or talk on the phone. (ECF No. 6-7, PageID.259).  Plaintiff also noted that he can only lift 10 to 15 pounds

and maybe walk half a block but does not do any shopping. (*Id.* at PageID.262–63). *See Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 806 (6th Cir. 2011) (the ALJ properly considered the plaintiff's daily activities in discounting treating physician's opinion). This evidence shows that the ALJ's decision to find Dr. Daly's opinion partially persuasive was supported by substantial evidence.

### c.  The ALJ's Finding that the Plaintiff's Fracture and Arthrotomy Left Hip Did Not Meet and/or Equal the Criteria of Listing 1.18 is Proper

Plaintiff argues the ALJ's finding that his condition does not qualify for Listing 1.18 was incorrect as he was required to use a walker from 2018 to 2020 following his left hip operation and this meets the requirement that Plaintiff must use an "assistive device requiring the use of both hands." (ECF No. 10, PageID.1169). In sum, the ALJ erroneously found that Plaintiff did not meet Listing 1.18 because he required a cane, rather than a two-handed walker. (ECF No. 10, PageID.1171).

The Commissioner counters that Plaintiff's claim that he meets Listing 1.18 is faulty for two reasons: (1) his claim is based on solely his testimony and not medical evidence, and (2) the record does not contain evidence from a medical source that Plaintiff had a documented need for an assistive device requiring the use of both hands. (ECF No. 12, PageID.1195–96).

Listing 1.18 is for abnormality of a major joint in any extremity.  This listing requires:

(A) Chronic joint pain or stiffness; and

(B) Abnormal motion, instability, or immobility of the affected joint(s); and

(C) Anatomical abnormality of the affected joint(s) noted on

(1) Physical examination (for example, subluxation, contracture, or bony or fibrous ankylosis) or

(2) Imaging (for example, joint space narrowing, bony destruction, or ankylosis or arthrodesis of the affected joint); and

(D) Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months and medical documentation of at least one of the following:

(1) A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and sealed mobility device involving the use of both hands (see 1.00C6e(i)); or

(2) An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), and a documented medical need (see 1.00C6a)  for a one-handed, hand-held assisted device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)); or

(3) An inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4).

32

20 C.F.R. § Pt. 404, Subpt. P. App. 1 §1.18.

At Step Three, the ALJ found that none of the impairments, either independently or in combination, met or medically equal in severity or duration the criteria listings of 1.18, 1.19, 1.22, or any other listing. (*Id.* at PageID.38). The ALJ noted that although the claimant used a walker for a short period of time following his gunshot wound, subsequent medical records noted that claimant either used a cane or did not require assistance when standing or walking. (*Id.* at PageID.39). Further, Plaintiff's examinations failed to note any deficits to upper extremity strength or function. (*Id.* at PageID.39). The ALJ concluded that as the medical record was void of medical documentation of the need for an assistive device requiring the use of both hands or the inability to use one or both upper extremities, claimant's impairments did not rise to listing level severity under Listings 1.18, 1.19, and 1.22. (*Id.* at PageID.39). Thus, Plaintiff does not in fact satisfy criteria D of Listing 1.18. *See Cianfano v. Kijakazi*, 2023 WL 6455758 (S.D.N.Y. Aug. 24, 2023) (plaintiff's failure to satisfy the final criteria of Listing 1.18 supported the ALJ's finding that he did not qualify for the listing).

Support for the ALJ's findings in Step Three appears in his Step Four analysis. There, the ALJ points to Plaintiff's physical therapy records which show that although he experienced leg pain at times when standing for more than 20 minutes, the record "generally notes no limitations with is ability to stand." (ECF No. 6-3,

PageID.44).  Further, examinations showed that Plaintiff displayed a normal balance at times and retained the ability to stand of either leg for 30 seconds.  (*See id.*).  And the ALJ notes that while Plaintiff did not consistently make progress at therapy, records indicate that he was not always compliant with attendance or completing his home exercise program.  (*See id.*).  While there are records which support Plaintiff's position, this is not sufficient to find that the ALJ's opinion was not supported by substantial evidence.  *See generally Bazzi v. Colvin*, 2015 WL 1245894, at *5 (E.D. Mich. Mar. 18, 2015) ("If the Commissioner's decision is supported by substantial evidence, 'it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion.'" (quoting *Cutlip*, 25 F.3d at 286)).

### H.  Conclusion

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 10), **GRANTING** the Commissioner's motion, (ECF No. 12), and **AFFIRMING** the Commissioner's final decision denying benefits.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and

recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1.) Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981.) The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d.) The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: November 2, 2023                    S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge